UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GERRY MOBLEY, JR.,   : CIVIL NO: 1:13-CV-00772
          :
    Plaintiff   : (Magistrate Judge Schwab)
          :
  v.        :
          :
C.O. SNYDER, *et al.*    :
          :
    Defendants  :
          :

## MEMORANDUM
September 1, 2015

## I. Introduction.

The plaintiff, Gerry Mobley, Jr., contends that the defendants denied him emergency medical care when he was in acute cardiac distress as retaliation because he told another prisoner to file a grievance and that he would be a witness for him. Mobley also contends that the defendants retaliated against him and tried to cover up their wrongdoing by issuing him false misconduct reports. Currently pending is the defendants' motion for summary judgment. For the reasons that follow, we will grant in part and deny in part that motion. We will grant the motion as to all of Mobley's claims except his retaliation claim against one defendant for issuing a misconduct report charging Mobley with making threats.

## II. Background and Procedural History.

Mobley, a state prisoner proceeding *pro se*, commenced this 42 U.S.C. § 1983 case by filing a complaint and an application for leave to proceed *in forma pauperis*. Although Mobley is currently incarcerated at the State Correctional Institution at Green, he is complaining about events that happened at the State Correctional Institution at Huntingdon (SCI-Huntingdon).

In August of 2013, Mobley filed an amended complaint naming as defendants the following officers and officials of SCI-Huntingdon: (1) Corrections Officer Snyder; (2) Corrections Officer Fessler; (3) Sergeant Prokop; (4) Corrections Officer Means;[1] (5) Corrections Officer Weakland;[2] (6) Corrections Officer Rhodes; (7) Corrections Officer Nickum; (8) Corrections Officer Booher; (9) Lieutenant Orndorf; (10) Lieutenant Dunkle; (11) Captain Stevens; (12) John/Jane Doe #3; (13) John/Jane Doe #4; and (14) Superintendent Bickell. Mobley alleges the following in his amended complaint.

On October 22, 2012, Mobley visited a cardiologist at J.C. Blair Memorial Hospital. On October 25, 2012, Mobley was seen by the medical staff at SCI-Huntingdon for ongoing chest pains, rapid heartbeat, shortness of breath, and as a follow up to his visit a few days earlier to the cardiologist. Later on October 25th,

---

[1] Although Mobley initially identified this defendant as John Doe #1, he later identified him as Officer Means.

[2] Although Mobley initially identified this defendant as John Doe #2, he later identified him as Officer Weakland.

Mobley overhead another inmate—Anthony Earls—express concerns to defendants Prokop and Fessler about having to share a cell with a particular inmate. Although Earls requested to talk to a "white hat," *i.e.,* a lieutenant, Prokop and Fessler denied his request and ordered Earls to return to his cell. As Earls walked past Mobley's cell, Mobley told Earls that Prokop and Fessler cannot deny him a "white hat," that he should file a grievance if he does not feel safe with his cellmate, and that Earls can put him down as a witness to the fact that he had asked Prokop and Fessler to speak to a "white hat." According to Mobley, he and Earls continued to talk and Earls expressed his frustration. Defendant Snyder overheard their conversation and ordered Earls to his cell. After Earls directed his frustration at Snyder, Snyder ordered him to "have a seat on center," which was an indication that Earls would be placed in the Restricted Housing Unit (RHU), also known as the hole, because of a disciplinary infraction. Mobley alleges that defendant Snyder then told defendants Prokop and Fessler that he would file a misconduct report against Earls and that he should put "that mutha' fucker Mobley in the hole too." Mobley then told Snyder to keep him out of it, to which Snyder responded: "You was up there running your mouth. You keep running your mouth and you can join Earls on center."

That same day, around 6:00 p.m., Mobley asserts that he began experiencing cardiac symptoms. According to Mobley, he had tightness and sharp pains in his

chest, his heart was pounding, he was light headed, and he was breathing heavy.

Mobley called to defendant Snyder and told him that he did not feel well and that

his chest hurt. According to Mobley, Snyder responded by stating: "Oh you need

me now. Didn't you and your buddy Earls have a lot to say earlier[?]" Mobley

alleges that he emphatically reiterated that he needed medical assistance, and

Snyder responded by saying that he was not calling anybody and that he would put

Mobley in the hole. According to Mobley, Snyder then walked away without

summoning help.

A short time later, Mobley heard Snyder falsely tell defendants Onrdorf,

Stevens, Dunkle, Rhodes, Nickum, Fessler, and Prokop that Mobley had threatened

him. Thereafter, defendant Dunkle ordered Mobley to "cuff up," and defendants

Dunkle, Rhodes, and Nickum escorted him to the RHU. Mobley details his

numerous requests for medical assistance, and he alleges that defendants Fessler,

Means, Weakland, Dunkle, Rhodes, Nickum, Prokop, Orndorf, Stevens, and

Snyder ignored his requests.

According to Mobley, defendant Dunkle threatened to place Mobley in a

hard cell, or psychiatric observation cell, if he did not shut up. Although defendant

Dunkle called the medical department once Mobley arrived in the RHU, he did not

tell the medical staff that Mobley was having chest pains. Instead, he just told the

medical staff that, if Mobley gets medicine, they were to bring it. According to

Mobley, he was placed in a cold cell without basic items and with no mattress and no underclothes (just a jumpsuit and shoes).  Mobley again repeatedly pleaded for medical assistance, and again, he alleges, defendants Rhodes, Nickum, and Booher ignored his pleas.

Later, defendant Booher delivered to Mobley two misconduct reports from defendants Snyder, Fessler, Prokop, Orndorf, and Stevens.  According to Mobley, the misconduct reports were fabricated and gave a false account of what had transpired.  Mobley contends that the defendants issued the misconduct reports to attempt to cover-up their own misconduct in refusing to provide him with medical assistance.  Mobley also contends that the defendants falsified the misconducts in retaliation for his earlier comments that Earls should file a grievance and that he would be a witness for Earls.

Mobley continued to ask for medical assistance, and Booher again ignored him.  Later, a corrections officer provided Mobley with a mattress, and when Mobley asked for medical assistance, the officer told him that the pill-line nurse was coming soon.  A short time later, Mobley was given underclothes and basic items.  According to Mobley, his chest was still hurting, he had a dull pain in his left arm and armpit, he felt nauseous, he had pain going down his arm and in his face and jaw, and everytime he tried to sit up or move it felt like his chest was going to explode.

Finally, sometime after 8:30 p.m., a nurse came to Mobley's cell and noticed his condition. An EKG was done, and Mobely was given Nitroglycerin. At about 9:15 p.m., Mobley was taken to the hospital, and, according to Mobley, he was given heart attack and preventative care. The next day, Mobley was returned to SCI-Huntingdon.

According to Mobley, he "suffered a heart attack or serious heart damage" on October 25, 2012, between 6:00 p.m. and 9:30 p.m. Mobley alleges that his need for medical assistance at the time was plain enough to be readily recognized by defendants Snyder, Fessler, Means, Weakland, Prokop, Dunkle, Rhodes, Nickum, Orndorf, Stevens, and Booher. He alleges that as the result of the lack of medical treatment, he suffered intense physical pain as well as emotional distress. He alleges that two months later he discovered that he suffers from Left Ventricular Hypertrophy and Tricuspid Regurgitation. According to Mobley, both conditions are a result of high blood pressure, heart attack, and heart injury. Mobley contends that his heart disease was aggravated by the delay in treating his cardiac distress on October 25, 2012, and he will experience diminished health for the rest of his life as a result of the delay. Further, although he did not need Nitroglycerin before then, since October 25, 2012, Mobley has been placed permanently on Nitroglycerin for ongoing chest pains and heart disease. According to Mobley, he continues to suffer emotional trauma and symptoms of

heart failure as a result of the callous manner in which the defendants denied him medical care.  Mobley also alleges that his ability to earn a living and his quality of life have been diminished.

On October 30, 2012, Mobley filed a grievance about the alleged denial of medical treatment and the alleged retaliation that he suffered.  Defendant Stevens responded to the grievance, and in an attempt to cover up his own misconduct and the misconduct of others, Stevens falsely stated that Mobley never requested medical care.

Although there is substantial overlap between some of Mobley's claims, he presents 13 counts in his amended complaint.  Count One is claim for retaliation against defendants Snyder, Fessler, and Prokop for denying him medical care, for falsifying misconducts, and for placing him in the RHU.  Count Two is an Eighth Amendment medical claim against defendants Snyder, Fessler, Prokop, Means, Weakland, Dunkle, Rhodes, Nickum, Orndorf, and Stevens.  Count Three is also an Eighth Amendment medical claim, and it appears to be the same as Count Two except that it is against defendant Booher as well as the defendants named in Count Two.  Count Four is an Eighth Amendment claim against defendant Snyder for placing Mobley in the RHU as well as a claim against defendants Fessler, Prokop, Means, Weakland, Ornforf, Dunkle, Rhodes, Nickum, Booher, and Stevens for failing to intervene and get Mobley emergency medical care and, it appears, by

acquiescing in defendant Snyder's placement of Mobley in the RHU. Count Five

is an Eighth Amendment claim against defendants Dunkle, Rhodes, Nickum,

Snyder, Fessler, Prokop, Orndorf, Stevens, Means, and Weakland based on

Mobley's placement in handcuffs and placement in the RHU as well as an Eighth

Amendment claim against Dunkle, Rhodes, Nickum, and Booher for his

confinement for hours in a cold cell with no socks, no underclothes, and no

mattress. Count Six contains an Eighth Amendment claim and a retaliation claim

against defendant Snyder for falsification of a misconduct report to cover up his

purported wrongdoing. Count Seven is an Eighth Amendment claim against

defendants Fessler, Prokop, Orndorf, Snyder, and Stevens for falsification of a

misconduct to cover up purported wrongdoing. Count Eight is a conspiracy claim

under 42 U.S.C. § 1983 against defendants Stevens, Dunkle, Prokop, Snyder, and

Fessler for falsifying misconducts and using the grievance system to cover up

wrong doing. Count Nine is an Eighth Amendment failure-to-train and failure-to-

supervise claim against defendants Stevens and Bickell for failure to train the other

officers regarding providing prisoners access to medical care. Count Ten is a

failure-to-screen and failure-to-train claim against John/Jane Does #3 and #4.

Count Eleven is a claim against defendants Snyder, Fessler, Prokop, Means,

Weakland, Orndorf, Stevens, Dunkle, Rhodes, Nickum, and Booher for refusal to

perform duties imposed by Pennsylvania statutes, the Pennsylvania Code, and

Department of Corrections polices.  Count Twelve is an Intentional Infliction of

Emotional Distress claim against defendants Snyder, Fessler, Prokop, Means,

Weakland, Orndorf, Stevens, Dunkle, Rhodes, Nickum, Booher, and Bickell.  And

Count Thirteen is a defamation claim against defendants Snyder, Fessler, Prokop,

Orndorf, Stevens, Dunkle, and Bickell.

The defendants filed a partial motion to dismiss the amended complaint, and

the Court granted that motion and dismissed the claims against the defendants in

their official capacities, dismissed the failure-to-train and failure-to-supervise

claims against defendant Bickell, and dismissed as moot Mobley's claims for

injunctive relief.  Later, the Court dismissed defendants John/Jane Doe #3 and #4.

The parties consented to proceed before a magistrate judge pursuant to 28

U.S.C. § 636(c), and the case was referred to the undersigned.  The remaining

defendants filed an answer to the amended complaint, and the parties engaged in

discovery.  The remaining defendants then filed a motion for summary judgment,

and that motion has been briefed.  For the reasons that follow, we will grant in part

and deny in part that motion.

## III.  Summary Judgment Standards.

The defendants moved for summary judgment under Rule 56(a) of the

Federal Rules of Civil Procedure, which provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing

10

that the materials cited do not establish the absence . . . of a genuine dispute."

Fed.R.Civ.P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'"

*N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the

pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Further, a party that moves for summary judgment on an issue for which he bears the ultimate burden of proof faces a difficult road. *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011). "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir. 2007) (footnote omitted). A party who has the burden of proof must persuade the factfinder that his propositions of fact are true, and "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *Id.* "Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will." *Id.*

## IV. Discussion.

The defendants contend that they are entitled to summary judgment because Mobley failed to properly exhaust administrative remedies. In the alternative, they contend that they are entitled to summary judgment on the merits of Mobley's

claims.  They further contend that Mobley's state-law claims are barred by

sovereign immunity.


### A.  Exhaustion of Administrative Remedies.

#### 1. The Exhaustion Requirement.

The Prison Litigation Reform Act requires a prisoner to exhaust available

administrative remedies prior to filing an action challenging prison conditions in

court.  The Act provides:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law, by a
> prisoner confined in any jail, prison, or other correctional
> facility until such administrative remedies as are available are
> exhausted.

42 U.S.C. §1997e(a).  "Requiring exhaustion allows prison officials an opportunity

to resolve disputes concerning the exercise of their responsibilities before being

haled into court." *Jones v. Bock*, 549 U.S. 199, 204 (2007).  "This has the potential

to reduce the number of inmate suits, and also to improve the quality of suits that

are filed by producing a useful administrative record." *Id.*  Thus, the benefits of the

exhaustion requirement "include allowing a prison to address complaints about the

program it administers before being subjected to suit, reducing litigation to the

extent complaints are satisfactorily resolved, and improving litigation that does

occur by leading to the preparation of a useful record." *Id.* at 219.  While the

exhaustion requirement serves to alert prison officials to a problem, "notice to those who might later be sued . . . has not been thought to be one of the leading purposes of the exhaustion requirement." *Id.*

In accordance with § 1997e(a), the exhaustion of available administrative remedies is mandatory, *Booth v. Churner*, 532 U.S. 731, 739 (2001), and the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). A prisoner must "exhaust all available administrative remedies" regardless of whether the administrative process may provide the prisoner with the relief that he is seeking. *Nyhuis v. Reno*, 204 F.3d 65, 75 (3d Cir. 2000). "[C]ompliance with the administrative remedy scheme will be satisfactory if it is substantial." *Id.* at 77. Failure to exhaust available administrative remedies is an affirmative defense. *Jones v. Bock,* 549 U.S. 199, 216 (2007). As such, the defendant has the burden of pleading and proving that the prisoner failed to exhaust administrative remedies. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

42 U.S.C. § 1997e(a) requires proper exhaustion. *Woodford v. Ngo,* 548 U.S. 81 (2006). In other words, it requires more than simple exhaustion, *i.e.*, more than that there is no further process available to the prisoner within the grievance system. *Spruill v. Gillis*, 372 F.3d 218, 227-31 (3d Cir. 2004). Section 1997e(a)

requires that a prisoner follow the procedural requirements set forth in the administrative remedy process that is available to him. *Id.* at 231. The prison grievance procedures supply the yardstick for measuring whether exhaustion was proper. *Id. See also Jones,* 549 U.S. at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). Because the prison grievance procedure provides the yardstick for what is required to be placed in a grievance, failure to comply with the requirements of the grievance process may result in a prisoner procedurally defaulting his claims. *Spruill*, 372 F.3d at 230-232. But a prisoner's procedural default is excused when, in response to a grievance, the prison addresses a claim on the merits notwithstanding the procedural default. *Id.* at 234 (holding that the grievance officer's recognition that a certain defendant was involved in the events excused any procedural defect in not naming that defendant in the grievance).

## 2. DC-ADM 804.

The Pennsylvania Department of Corrections (DOC) has implemented an official Inmate Grievance System, which is governed by Administrative Directive

804 (DC-ADM 804).[3]  DC-ADM 804 sets forth a three-tier administrative remedy system: First, a prisoner is required to present his grievance to the Facility Grievance Coordinator for initial review within fifteen days after the events upon which the grievance is based; Second, a prisoner is required to appeal an adverse determination by the Facility Grievance Coordinator to the Facility Manager; and Third, the prisoner must appeal to the Secretary's Office of Inmate Grievances and Appeals (SOIGA).  DC-ADM 804 addresses what a grievance must contain:

> **The inmate must include a statement of the facts relevant to the claim.  The statement of facts shall include the date, approximate time and location of the event(s) that gave rise to the grievance.  The inmate shall identify individuals directly involved in the event(s).**
> . . .
> **The inmate will also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.  If the inmate desires compensation or other legal relief normally available from a court, the inmate shall request the specific relief sought in his/her initial grievance.**

DC-ADM 804 Procedures Manual §1.A.11-12 (emphasis in original).

"Only an issue that was raised for Initial Review, determination of frivolousness, rejection and/or placement on grievance restriction may be appealed." DC-ADM 804 Procedures Manual §2.A.1.c.   Further, "[o]nly issues

---

[3] When we refer to DC-ADM 804, we are referring to both the DOC's policy statement and its accompanying procedures manual.

appealed to the Facility Manager may be appealed *to* Final Review." DC-ADM 804 Procedures Manual §2.B.1.b (emphasis in original).

DC-ADM 804 also provides that "[a] grievance ***directly related to a specific inmate misconduct charge or a specific disciplinary sanction and/or the reasons for placement in administrative custody*** will not be addressed through the Inmate Grievance process and must be addressed through Department policy **DC-ADM 801, "Inmate Discipline"** and/or **DC-ADM 802, "Administrative Custody Procedures."** DC-ADM 804 Procedures Manual §1.A.7 (emphasis in original).

### 3. Except for Mobley's Misconduct-Related Claims, All of Mobley's Federal Claims are Barred Because Mobley Failed to Properly Exhaust those Claims.

According to the defendants, Mobley filed only one grievance relevant to the claims in this case—Grievance 434040. The defendants contend that Mobley's remaining claims, which are claims for monetary damages, are barred because although Mobley filed Grievance 434040 and appealed that grievance to final review, he did not request monetary damages in that grievance as required by DC-ADM 804. They also contend that certain claims are barred and certain defendants should be dismissed because Mobley failed to identify them in Grievance 434040.

Before we examine Grievance 434040, we note that because DC-ADM 804 specifically excludes from its coverage grievances directly related to misconduct charges or disciplinary sanctions, Mobley's claims that the defendants issued him

18

misconduct reports in retaliation for his statements earlier in the day to Inmate Earls, his claims that the misconduct reports were an attempt to coverup the defendants' denial of medical care, and his claims that the issuance of the misconduct reports violated the Eighth Amendment are not barred by any failure to exhaust/procedural default under DC-ADM 804.[4]

Before turning to Grievance 434040, we also address Mobley's contention that he filed another relevant grievance—Grievance 448308—relating to his claim that defendant Stevens conspired with other defendants to use the grievance process to cover up their denial of medical care. In Grievance 448308, Mobley complained about defendant Stevens acting as the Grievance Officer as to Grievance 434040 and responding to Grievance 434040 even though he was purportedly involved in the underlying denial of medical care. *See Doc. 142-7* at 40. Mobley filed Grievance 438308 on February 13, 2013. *Id.* The Grievance Coordinator rejected that grievance as untimely because it was not filed within 15 days of the events at issue. *Id.* at 39. The Superintendent upheld that rejection, and although Mobley appealed that rejection to final review, SOIGA dismissed his

---

[4] In accordance with the terms of DC-ADM 804, grievances relating to specific misconduct charges are addressed through DC-ADM 801, rather than DC-ADM 804. Although the defendants provide the misconduct reports and Mobley's appeals of those misconduct reports, they do not argue that Mobley failed to exhaust or procedurally defaulted his claims relating to the misconduct reports under DC-ADM 801. Further, as § 1997e(a) applies only to federal claims, Mobley's state-law claims are not barred by the exhaustion-requirement of §1997e(a).

appeal on the basis that he did not provide the required documentation for proper review. *Id.* at 41-44.

Mobley disputes that he did not provide the required documentation for final review, and he disputes that Grievance 448308 was not timely filed. With regard to that latter contention, Mobley asserts that, although defendant Stevens acted as the Grievance Officer and responded to Grievance 434040 on November 8, 2012, he did not file Grievance 448308, complaining about Stevens involvement with Grievance 434040, until February of 2013 because he was confused about whether there were two Captain Stevens at SCI-Huntingdon. In early February 2013, Mobley submitted a request to Connie Green, the Grievance Coordinator at SCI-Huntingdon, asking whether there are two Captain Stevens at SCI-Huntingdon. *Doc. 142-7* at 35. Green responded to Mobley on February 12, 2013, that there is only one Captain Stevens at SCI-Huntingdon. *Id.* at 35.[5] Mobley asserts that he timely filed Grievance 448308 because he filed that grievance within 15 days of learning that the Captain Stevens that acted as the Grievance Officer for Grievance 434040 was the same CO IV Stevens that was identified in one of the misconducts (Misconduct B576458) as a witness to the underlying events.

---

[5] Two days later, in response to another request slip by Mobley complaining that Stevens violated DC-ADM 804 by acting as the Grievance Officer for Grievance 434040, Green informed Mobley that Grievance 434040 could not be reopened, but she would ensure that a copy of his request slip was attached to the record of Grievance 434040. *Id.* at 37.

Stevens's response to Grievance 434040 was provided to Mobley on or about November 8, 2012, and his response specifically lists his name as "Capt. K. Stevens" and his Title as "CO4." *Doc. 132-3* at 3. Thus, there was no reasonable basis for Mobley not to know that Captain Stevens and CO IV Stevens were the same person. Moreover, even assuming that Mobley was reasonably confused, he has not explained why he waited until February of 2013 to seek clarification, given that Misconduct B576458 was issued on October 25, 2012 and Stevens's response to Grievance 434040 was issued on November 8, 2012. In sum, a reasonable trier of fact could not conclude that Grievance 448308 was timely filed. Thus, Mobley procedurally defaulted the claim he raised in Grievance 448308.

Finally, we turn to Grievance 434040. At the end of October of 2012, Mobley filed a grievance, which was assigned Grievance No. 434040. *See Doc. 132-3* at 2. In that grievance, Mobley refers to "[r]acism, wanton infliction of pain, deliberate indifference to serious medical need, denying access to medical attention, and inmate abuse." *Id.* He asserts that Officers Snyder, Fessler, and John Does 1 & 2 ignored his complaints of chest pain and his requests for medical care. *Id.* He further asserts that instead of taking him to the medical department, the officers took him to the RHU, where he told Lieutenant Dunkle his chest was hurting and he needed medical assistance. *Id.* He asserts that nurses later gave him an EKG and nitroglycerin, and he was taken by ambulance to an outside hospital.

*Id.* Mobley states in Grievance 434040 that "[a]ny retaliation will be noted and reported to legal authorities" and that he "will litigate in court and seek disciplinary action" against the officers and all parties. *Id.*

Defendant Stevens denied that grievance, and Mobley appealed to the Superintendent. In his appeal, Mobley stated that he "will sue for $ 1 million dollars," and he requested a thorough investigation, that the defendants be disciplined, and a "complete separation." *Id.* at 4. Defendant Bickell denied that appeal, and Mobley appealed to SOIGA. In his final appeal, Mobley again demanded an investigation and he stated that he "will ask for $1,000.00" for each day he spends in the RHU, and he "will ask for $50,000.00" for the denial of medical care, the cover up, and the false charges. *Id.*at 6. SOIGA upheld the Superintendent's response. *Id.*at 6.

DC-ADM 804 requires an inmate that "***desires compensation or other legal relief normally available from a court***" to request the "***specific relief sought in his/her initial grievance***." DC-ADM 804 Procedures Manual §1.A.11-12 (emphasis in original). Monetary damages qualify as compensation or other legal relief normally available from a court. And Judges have dismissed claims for monetary damages or granted summary judgment to defendants as to such claims where the prisoner did not seek monetary damages in his grievance. *See e.g. Sanders v. Beard,* No. 3:09-CV-1384, 2013 WL 1703582, at *6 (M.D.Pa. Apr. 19,

2013); *Collins v. Walsh*, No. 1:09-CV-1932, 2012 WL 3536803, at *3 (M.D. Pa. Aug. 15, 2012).

Relying on *Holbrook v. Walters,* Civil No. 3:CV-03-0033, 2004 U.S. Dist. LEXIS 29461 (M.D. Pa. Feb. 26, 2004), Mobley asserts that his failure to request monetary damages in his initial grievance is excused because he requested monetary damages in his grievance appeals and neither the Superintendent at the second level or SOIGA at the third level of those appeals stated that such request for monetary damages was waived because he did not include it in his initial grievance. In *Holbrook*, the prisoner did not seek monetary damages in his initial grievance, but he did request monetary damages at the second and third stages of the grievance process. *Id.* at *18. At the second stage, the Superintendent specifically addressed Holbrook's request for monetary damages and denied that request for monetary damages, and at the third stage the "Chief Grievance Coordinator noted that he 'carefully reviewed' the entire record of the grievance and 'the issues [Holbrook] raised to final review,' which would have included Plaintiff's request for monetary damages." *Id.* at *18-19. Given those circumstances, the Court in *Holbrook* concluded that Holbrook satisfactorily exhausted administrative remedies. *Id.* at *19.

Here even assuming for the sake of argument that Mobley's statements in his grievance appeals that he "will sue for" and "will ask for" monetary

23

compensation can be construed as a request for monetary compensation through the administrative remedy process, rather than a statement of his intent with respect to a later lawsuit, *Holbrook* does not compel the conclusion that Mobley's failure to request monetary damages in initial grievance should be excused. *Holbrook* is distinguishable because that case dealt with an earlier version of DC-ADM 804, which, unlike the version applicable in this case, did not require a prisoner seeking monetary damages to specifically request the relief sought in his or her initial grievance. Rather, the version of DC-ADM 804 in effect at the relevant time in *Holbrook* merely stated that a prisoner "may include requests for 'compensation or other legal relief normally available from a court.'" *Holbrook,* 2004 U.S. Dist. LEXIS 29461, at * 17 (quoting the version of DC-ADM 804 in effect at the time). Further, in *Holbrook,* the Superintendent explicitly addressed Holbrook's request for monetary compensation when deciding his appeal. Here, however, the Superintendent did not explicitly (or implicitly) address Mobley's statement that he "will sue for $ 1 million dollars." Nor did SOIGA address Mobley's request for monetary compensation made for the first time in his appeals. Given this, *Holbrook* is distinguishable, and because Mobley did not specifically request monetary damages in his initial grievance, as required by the version on DC-ADM 804 in effect at the relevant time, Mobely procedurally defaulted his claims for

monetary damages (except as noted above, his misconduct-related claims, which are not governed by DC-ADM 804).[6]

## B. Misconduct-Related Claims.

Mobley's misconduct-related claims are based on two misconduct reports that he received on October 25, 2012. As to the first misconduct report, on October 25, 2012, defendant Snyder issued Misconduct Report B576457 charging Mobley with threatening an employee and with using obscene, abusive language to staff. *Doc. 132-5* at 2. In that Misconduct Report, Snyder stated that while he was dealing with a situation on the second tier of A Block, Mobley said "these pussys always hide behind misconducts and that bitch is scared." *Id.* When Mobley was questioned about what he said, he said "Fessler, she's a bitch, she's scared on this block." *Id.* According to Snyder, he then told Mobley that he would be receiving a misconduct report, and Mobley responded by saying: "I don't give a Fuck hide behind the misconduct to [sic]" and "You can come in here and see me, now, tommorow [sic] or next week I don't give a fuck." *Id.* Finally, Snyder states in the misconduct report that he while was at the desk notifying control, Mobley stated "come on up here pussy." *Id.* The hearing examiner found Mobley guilty

---

[6] Given this conclusion, we do not address the defendants' arguments that Mobley procedurally defaulted certain claims and the claims against certain defendants by failing to raise those claims and by failing to name those defendants in Grievance 434040. Nor do we address the merits of the procedurally defaulted claims.

and sanctioned him with 60 days of disciplinary custody time for the abusive-language charge and 60 days for the threat charge.

As to the second misconduct report, on October 25, 2012, defendant Fessler issued Misconduct Report B576458 charging Mobley with using abusive, obscene, or inappropriate language to an employee. *Doc. 132-6* at 2.  In that Misconduct Report, Fessler stated that while Mobley was being escorted to the RHU, he looked at her and called her "dick eating bitch" and that he also called her a "bitch" and "pussy" repeatedly. *Id.*  The hearing examiner found Mobley guilty and sanctioned him with 60 days of disciplinary custody time.

Mobley claims that the misconducts reports were false and violated his Eighth Amendment rights, were issued as part of a conspiracy to cover up the defendants' refusal to provide him with medical care, and were issued in retaliation for Mobley telling Inmate Earls to file a grievance and to put him down as a witness.  We address each of these claims in turn.

### 1. Eighth Amendment Claim.

Mobley claims that the defendants violated the Eighth Amendment by issuing him false misconduct reports, which resulted in him spending time in the RHU.

An Eighth Amendment claim gives rise to a two-prong analysis: Eighth Amendment claims must satisfy both an objective component (the deprivation

must be sufficiently serious) and a subjective component (the defendant must have been deliberately indifferent). *Young v. Quinlan*, 960 F.2d 351, 359-60 (3d Cir. 1992). As to the objective component, the Eighth Amendment is violated only when an inmate is deprived of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To violate the Eighth Amendment, the prisoner must be "denied basic human needs, such as food, clothing, shelter, sanitation, medical care [or] personal safety." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997).

A false misconduct charge does not constitute the denial of a basic human need. Thus, it "does not by itself qualify as a violation of the Eighth Amendment." *Makenson v. Luzerne Cnty. Corr. Facility*, No. 4:CV-13-2204, 2014 WL 4187666, at *4 (M.D. Pa. Aug. 22, 2014). Further, merely being placed in segregated confinement as a result of a misconduct charge does not violate the Eighth Amendment's protection against cruel and unusual punishment. *Griffin,* 112 F.3d at 709. Thus, the defendants are entitled to summary judgment as to the Eighth Amendment claims based on the purportedly false misconducts.

### 2. Conspiracy to Cover Up.

Mobley claims that the defendants conspired to cover up their wrongdoing by falsifying misconduct reports.

"[C]onspiracy under § 1983 is not an independent cause of action, but a means to impute liability on third persons." *Ober v. Miller*, No. CIV.A. 1:04-CV-1669, 2007 WL 4443256, at *18 (M.D. Pa. Dec. 18, 2007); *see also Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980) (stating that a § 1983 "[c]onspiracy is merely a mechanism by which to obtain the necessary state action, or to impose liability on one defendant for the acts of the others performed in pursuance of the conspiracy"(citations omitted)). "[A] §1983 conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Twp. of Tilden,* 423 F. App'x 234, 239 (3d Cir. 2011).

"The essence of a conspiracy is an agreement." *United States v. Kelly,* 892 F.2d 255, 258 (3d Cir. 1989). "To demonstrate the existence of a conspiracy under § 1983 [or *Bivens*], 'a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law.'" *LeBlanc v. Stedman*, 483 F. App'x 666, 670 (3d Cir. 2012)(quoting *Parkway Garage, Inc. v. City of Phila.,* 5 F.3d 685, 700 (3d Cir.1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392 (3d Cir. 2003)). "It is not enough that the end result of the parties' independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Perez v. Gamez*, 1:13-CV-1552, 2013 WL 6073877, at *9 (M.D. Pa. Nov. 18, 2013). Rather, the plaintiff must show that

the defendants acted in concert with the specific intent to violate the plaintiff's rights. *Davis v. Fox*, 3:12-CV-1660, 2013 WL 5656125, at * 5 (M.D. Pa. Oct. 15, 2013). Because direct evidence of a conspiracy is rarely available, the existence of a conspiracy may be inferred from the circumstances. *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009).

Further, "[a] cover-up, without more, cannot be the basis of a conspiracy claim under § 1983." *Epifan v. Roman*, No. 3:11-CV-02591-FLW, 2014 WL 4828606, at *7 (D.N.J. Sept. 29, 2014). Rather, a plaintiff must show how the purported cover up violated his constitutional rights. *Id.* at *6; *see also Bush v. City of Philadelphia*, No. CIV. A. 98-0994, 1999 WL 554585, at *4 (E.D. Pa. July 16, 1999) ("Cases decided in this court and elsewhere show that conspiracy by police officers to file false reports and otherwise cover up wrongdoing by fellow officers is not in and of itself a constitutional violation. It provides the basis for a § 1983 action only if it results in some constitutional harm to the plaintiff.").

While Mobley has presented declarations supporting the allegations in his complaint, he has not presented facts from which a reasonable trier of fact could conclude that defendants Snyder and Fessler reached an agreement among themselves or with any of the other defendants to issue the misconduct reports to violate Mobley's constitutional rights. And Mobley has not shown that any purported coverup violated his constitutional rights. Accordingly, the defendants

are entitled to summary judgment as to Mobley's claim that the defendants issued false misconduct reports as part of a conspiracy to cover up their refusal to provide him with medical care. Accordingly, the defendants are entitled to summary judgment as to the conspiracy to cover up claim based on the misconduct reports.

### 3. Retaliation.

Mobley claims that the misconduct reports were issued in retaliation for him telling Inmate Earls to file a grievance and to put him down as a witness.

"Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012). Retaliation claims are judged against exacting legal standards. A prisoner claiming that a defendant retaliated against him for exercising his constitutional rights must prove that: (1) his conduct was constitutionally protected; (2) he suffered "adverse action" at the hands of the defendant; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision of the defendant. *Carter v. McGrady,* 292 F.3d 152, 158 (3d Cir. 2002). "Once a prisoner has made his *prima facie* case, the burden shifts to the defendant to prove by a preponderance of the evidence that [he or she] 'would have made the same decision absent the protected conduct for reasons reasonably related to penological interest.'" *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3rd Cir. 2001)). Prison officials may prevail by proving that they would have made the same decision absent the protected

conduct for reasons reasonably related to a legitimate penological interest. *Rauser,* 241 F.3d at 334.

The defendants contend that Mobley cannot satisfy the first element of a retaliation claim because his statement to Inmate Earls to file a grievance and to put him down as a witness is not constitutionally protected conduct.  In so arguing, the defendants suggest that Mobley was attempting to assert the rights of a third party (Inmate Earls), and that encouraging another inmate to file a grievance should not be given greater weight than threatening to file a grievance, which the defendants contend is not constitutionally protected conduct.  Mobley, however, is not attempting to assert the rights of Inmate Earls.  Rather, he contends that he was retaliated against for his own speech, *i.e.,* his statements to Inmate Earls.  Further, although the defendants cite a couple of cases in support of their contention that threatening to file a grievance is not constitutionally protected conduct, on appeal in one of the cases cited by the defendants, the Third Circuit, while deciding the retaliation claim on other grounds, in dicta questioned the contention that merely threatening to file a grievance is not constitutionally protected speech. *See Stewart v. Varano*, 601 F. App'x 107, 111 (3d Cir. 2015)("The District Court concluded that Stewart had not engaged in such conduct here, because he had not actually filed a grievance when Eyster issued the misconduct; he had merely threatened to

do so.  But that is in fact Stewart"s allegation—that he was retaliated against for *speaking,* which did take place at the relevant moment.").

Moreover, even assuming that making threats to file a grievance is not constitutionally protected conduct, here Mobley did not threaten the officers with the filing of a grievance.  He merely told Inmate Earls to file a grievance and to put him down as a witness.   The defendants have not argued, or pointed to any case law holding, that such speech is of a type that falls outside the protection of the First Amendment. See *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 282–83 (3d Cir.2004) ("All speech is protected by the First Amendment except narrow categories that are entitled to no protection, including obscenity and 'fighting words.'"); *Torres v. Clark*, 522 F. App'x 103, 105-06 (3d Cir. 2013) (holding that a statement in a letter written by a prisoner that somebody is going to break an officer's jaw if he keeps acting like he his above the law was not constitutionally protected because it constituted a "true threat").

A prisoner's right to communicate with another prisoner may be limited by reasonable restrictions. *Turner v. Safley*, 482 U.S. 78, 89-94 (1987)(holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests" and upholding under that standard a regulation limiting correspondence between inmates at different institutions).  Further, a prisoner does not have a right to provide legal

assistance to another prisoner that enhances the protections otherwise available under *Tuner. Shaw v. Murphy*, 532 U.S. 223, 231-32 (2001)(declining "to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech" and holding that regardless of whether prisoner correspondence contains legal advice "the proper constitutional test is the one . . . set forth in *Turner*"). In this case, however, the defendants do not assert that Mobley violated any prison regulation by talking to Earls and telling Earls to file a grievance and to put him down as a witness. Thus, we conclude for purposes of the current motion for summary judgment that Mobley engaged in constitutionally protected speech.

The defendants do not contest that the misconduct reports, which led to disciplinary custody for Mobley, were adverse actions sufficient to satisfy the second element of a retaliation claim. The defendants contend, however, that because there was some evidence to support the misconduct charges, Mobley's retaliation claims based on the misconduct charges fail.[7]

---

[7] Although the defendants place this argument in a section of their brief relating to causation for the retaliation claims—both the retaliation claims based on the misconduct reports and the retaliation claims based on the denial of medical care (which medical-related claims Mobley failed to properly exhaust)—the argument relates to whether the defendants can prove by a preponderance of the evidence that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. The defendants make no other argument regarding causation as to the misconduct reports, and we

"[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001). In *Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit affirmed the grant of summary judgment to prison officials on claims that the officials took disciplinary actions against the prisoner for his legal activities. In *Carter,* based on the "sizeable quantum" of evidence of misconduct on the part of the prisoner, the court concluded that, even if the prison officials were motivated by animus to jailhouse lawyers, the prisoner's offenses "were so clear and overt" such that there was no genuine issue of material fact that the officials' actions were reasonably related to legitimate penological interests and the prisoner "would have been disciplined notwithstanding his jailhouse lawyering." *Id.* at 158-59. The court described the "sizeable quantum" of evidence of misconduct against the prisoner:

> In this case, Carter was never charged with misconduct for helping other inmates with legal matters or having their legal materials in his cell. Rather, he was charged with misconduct for undisputed violations of prison policy. The search and seizure of items from his cell were related to these

_____

note that the misconduct reports were issued within a few hours of Mobley's constitutionally protected conduct.

various violations.  Carter was discovered with a stolen typewriter in his cell.  The cell search uncovered an envelope containing two receipts for the typewriter, identical to the sales receipt and credit card sales slip faxed by the vendor.  As a result, Carter was disciplined with sixty days in the RHU.

Moreover, it is not disputed that Carter corresponded with Unger in violation of prison policy.  Carter conceded that he wrote a note to Unger without seeking authorization for that correspondence.  His cell was searched in connection with this allegation; he was written up and subsequently disciplined with thirty days for this conduct.  Additionally, there is no dispute that the amount of property kept by Richard Carter and Dana Carter in their cell exceeded the amount allowed by fire and safety regulations.  The materials were seized for this reason, and Carter was allowed to select up to two boxes of his personal material to keep in his cell.  Finally, in the course of searching Carter's cell in connection with the unauthorized use of the mails, prison officials found the newsletter, "The Last Line of Defense," a publication of which Carter was the editor and for which he had not requested or obtained approval by the SCI–Mahanoy administration.  The foregoing represents a sizeable quantum of misconduct evidence.

*Id*. at 158.

The defendants cite an Eighth Circuit decision—*Henderson v. Baird,* 29 F.3d 464, 469 (8th Cir. 1994)—and an unpublished Third Circuit decision—*Nifas v. Beard,* 374 F.App'x 241 (3d Cir. 2010)—for the proposition that retaliatory-disciplinary claims fail when there is some evidence supporting a guilty finding on the misconduct charge.  In *Nifas,* the Third Circuit held that "Nifas's retaliatory discipline claim fails because there is 'some evidence' supporting the guilty findings for the three disciplinary charges brought against Nifas after he filed his grievance in October 2006." *Id.* at 244.  In *Nifas,* the Third Circuit cited the Eighth

Circuit's decision in *Henderson*, which held that a finding based on "some evidence" that the prisoner committed the misconduct charged essentially "checkmates" a prisoner's retaliation claim.

We are bound, however, by the Third Circuit's published opinions, not its unpublished opinions. Thus, we must follow *Carter* rather than *Nifas*. "[I]n *Carter,* the controlling precedential case in this circuit, the Court of Appeals granted summary judgment for the defense based on the "quantum of evidence" in the record concerning the plaintiff's misconduct, not the mere fact that the prisoner had been found guilty of the misconduct." *Mincy v. McConnell*, 1:09-CV-236-SJM-SPB, 2012 WL 1436562, at *2 (W.D. Pa. Apr. 25, 2012)(quoting *Carter,* 292 F.3d at 152). "*Carter* should not be read as establishing a per se bar against retaliation claims in every instance where a prisoner is found guilty of an allegedly false misconduct charge." *Id*.[8]

---

[8] We note that the "some evidence" standard is borrowed from a due process case. *See Superintendent v. Hill*, 472 U.S. 445, 455 (1985)(holding that due process requires that there be some evidence to support the findings of the disciplinary hearing officer). In other contexts, the Third Circuit has distinguished due process claims from retaliation claims based on conduct protected by the First Amendment. *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000)(holding that *Sandin v. Conner,* 515 U.S. 472 (1995), does not preclude a claim that the prisoner was kept in administrative segregation in retaliation for filing civil rights actions against prison officials because retaliation may be actionable even when the retaliatory action does not involve a liberty interest); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)("We hold that the relevant question is not whether Rauser had a protected liberty interest in the privileges he was denied, but whether he was denied those privileges in retaliation for exercising a constitutional right."); *Smith*

Here, defendant Fessler charged Mobley with using abusive, obscene, or inappropriate language based on his purported statements that she is a "dick eating bitch," a "bitch," and a "pussy." *Doc. 132-6.* While Mobley disputes that he said exactly what Fessler claims that he said, he does not dispute that he used obsence language. In his declaration, Mobley admits that he made the following statements: "I need fucking medical, my fucking chest is hurting, fuck what you're talking about"; "I need fucking medical, I'm having chest pains"; "I need medical and y'all gonna set me up like this, my fucking chest hurts, that's some bitch as[s] shit, pussy shit." *See Doc. 142-1* at ¶¶32, 36 & 47 Given that it is undisputed that Mobley used obscene language, defendant Fessler would have made the same decision to issue the misconduct charge regarding obscene language absent Mobley's protected conduct for reasons reasonably related to a legitimate penological interest. Accordingly, defendant Fessler is entitled to summary judgment as to the retaliation claim based on Misconduct Report B576458.

---

*v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002)(noting, in the context of a claim by a prisoner that an officer issued a false misconduct report in retaliation for the prisoner's conduct toward the officer and to cover up a beating, that it had "previously held that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment guarantee of access to the courts," but concluding that Smith did not "claim that another constitutional right (such as access to the courts) was violated" and therefore his due process claim based on the falsified misconduct failed).

Defendant Snyder charged Mobley with threatening an employee and with using obscene, abusive language to staff based on Mobley's purported statements that "these pussys always hide behind misconducts and that bitch is scared"; "Fessler, she's a bitch, she's scared on this block"; "I don't give a Fuck hide behind the misconduct to [sic]"; "You can come in here and see me, now, tommorrow [sic] or next week  I don't give a fuck"; and "come on up here pussy." *Doc. 132-5* at 2.  Again, while Mobley disputes making those statements, as set forth above, he admits to using obscene language.  Given that admission, defendant Snyder would have made the same decision to issue the misconduct charge regarding obscene language absent Mobley's protected conduct for reasons reasonably related to a legitimate penological interest.

Snyder also, however, charged Mobley with threatening an employee based on Mobley's purportedly stating: "You can come in here and see me, now, tommorrow [sic] or next week  I don't give a fuck" and "come on up here pussy." *Doc. 132-5* at 2.  Mobley disputes that he made those statements or that he made any threats. See *Doc. 142-1* at ¶49 ("At no time while I was on A-Block between 6:00 -6:20 pm. did I 'yell' out of my cell or threatened defendant Snyder.  Nor was I yelling come up here pussy while he was at the desk calling control.  I did not tell him or ever make any statement to him that Fessler was a bitch and scared on this block . . ."); at ¶66 ("I did not threaten Snyder at no time on A Block between 6:00

38

-6:20 p.m."). Mobley has presented evidence that creates a genuine factual dispute about whether he made any threats. Unlike in *Carter*, there is not undisputed evidence of misconduct such that we can say as a matter of law that Snyder would have issued the misconduct report charging Mobley with threatening an employee notwithstanding Mobley's statements to Inmate Earls. While a reasonable trier of fact may well conclude that there was sufficient evidence to support the misconduct report, at the summary judgment stage, where we must construe the evidence in the light most favorable to Mobley, as the nonmoving party, on this record, we cannot draw that conclusion as a matter of law. Rather, we are constrained to conclude that a reasonable trier of fact who found Mobley's evidence credible could find that Snyder would not have issued the misconduct report charging Mobley with threatening an employee had Mobley not told Inmate Earls to file a grievance and to put him down as a witness. Accordingly, defendant Snyder is not entitled to summary judgment as to the retaliation claim based on Misconduct B576457 to the extent that report charged Mobley with threatening an employee.

### C. State–Law Claims.

In addition to federal claims, Mobley presents state law claims for the defendants' purported refusal to perform duties imposed by Pennsylvania statutes,

the Pennsylvania Code, and Department of Corrections polices, for intentional infliction of emotional distress, and for defamation. These claims are barred by sovereign immunity.

Sovereign immunity bars claims against the Commonwealth, its agencies, and its employees acting within the scope of their duties. *See* 1 Pa. Const. Stat. Ann. § 2310. But Pennsylvania law waives sovereign immunity in nine limited circumstances. These exceptions to the general grant of immunity to the Commonwealth and its employees are for negligent acts involving: (1) vehicle liability; (2) medical-professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa.C.S.A. § 8522(b). "Under Pennsylvania's sovereign immunity statute, 'an employee of the Commonwealth . . . acting within the scope of his or her employment or duties, is protected by sovereign immunity from the imposition of liability for intentional tort claims.'" *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 682 (M.D. Pa. 2010)(quoting *Holt v. NW. Pennsylvania Training P'ship Consortium, Inc.,* 694 A.2d 1134, 1139 (Pa.Cmmwlth.Ct. 1997)). '"[W]illful misconduct does not vitiate a Commonwealth employee's immunity if the employee is acting within the scope of his employment, including intentional acts

which cause emotional distress.'" *Id.* at 682 (quoting *Cooper v. Beard,* Civ. A. No. 06–171, 2006 WL 3208783, at *16 (E.D.Pa. Nov. 2, 2006)).  The exceptions to the Commonwealth's sovereign immunity must be strictly construed because the legislature waived immunity only in specific situations. *Moser v. Heistand,* 681 A.2d 1322, 1326 (Pa. 1996).

Because the defendants were acting within the scope of their employment in dealing with Mobley[9] and Mobley's state-law claims do not fall within any of the nine limited exceptions to sovereign immunity, the state-law claims are barred by sovereign immunity.

## V.  Summary.

Accordingly, for the foregoing reasons, the defendants' motion (doc. 129) for summary judgment will be **GRANTED IN PART** and **DENIED IN PART.** The motion will be granted as to all of Mobley's remaining claims except the

---

[9]  An employee's conduct falls within the scope of his or her employment when it: "(1) is the kind that the employee is employed to perform; (2) occurs substantially within the job's authorized time and space limits; (3) is motivated at least in part by a desire to serve the employer; and (4) if force was used by the employee against another, the use of force is not unexpectable by the employer." *Savage v. Judge*, No. Civ. A. 05-2551, 2007 WL 29283, at *5 (E.D. Pa. Jan. 2, 2006)(citing Restatement (Second) of Agency § 228).  Mobley does not argue that the defendants were not acting within the scope of their employment, and based on the summary judgment record, a reasonable trier of fact could not conclude that the defendants were not acting within the scope of their employment in their dealings with Mobley.

retaliation claim against defendant Snyder based on Misconduct B576457 to the extent that report charged Mobley with threatening an employee.

**<u>S/Susan E. Schwab</u>**
Susan E. Schwab
United States Magistrate Judge
