UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GERRY MOBLEY, JR., | : | CIVIL NO: 1:13-CV-00772 |
| | : | |
| Plaintiff | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| C.O. SNYDER, *et al.* | : | |
| | : | |
| Defendants | : | |
| | : | |

**<u>MEMORANDUM</u>**
June 20, 2016

## I.  Introduction.

The plaintiff, Gerry Mobley, Jr., contends that the defendants denied him emergency medical care when he was in acute cardiac distress as retaliation because he told another prisoner to file a grievance and that he would be a witness for him.   Mobley also contends that the defendants retaliated against him and tried to cover up their wrongdoing by issuing him false misconduct reports.  We previously granted the defendants' motion for summary judgment as to all claims except Mobley's retaliation claim against one defendant—Officer Snyder—for issuing a misconduct report charging Mobley with making threats.  With leave of court, Snyder filed a second motion for summary judgment raising the issue of qualified immunity.  Because, at the time Snyder issued the misconduct report, it

was not clearly established that a prisoner advising or encouraging another prisoner to file a grievance and list him as a witness was constitutionally protected speech, we will grant the second motion for summary judgment.  And because we will grant that motion, we will deny as moot Snyder's motion to supplement the second motion for summary, which seeks to raise an additional basis for summary judgment.

## II.  Background and Procedural History.

Mobley, a state prisoner proceeding *pro se*, began this 42 U.S.C. § 1983 case by filing a complaint and an application for leave to proceed *in forma pauperis*. Although Mobley is currently incarcerated at the State Correctional Institution at Albion, he is complaining about events that happened at the State Correctional Institution at Huntingdon (SCI-Huntingdon).

In August of 2013, Mobley filed an amended complaint naming as defendants the following officers and officials of SCI-Huntingdon: (1) Corrections Officer Snyder; (2) Corrections Officer Fessler; (3) Sergeant Prokop; (4) Corrections Officer Means;[1] (5) Corrections Officer Weakland;[2]

---

[1] Although Mobley initially identified this defendant as John Doe #1, he later identified him as Officer Means.

[2] Although Mobley initially identified this defendant as John Doe #2, he later identified him as Officer Weakland.

(6) Corrections Officer Rhodes; (7) Corrections Officer Nickum; (8) Corrections Officer Booher; (9) Lieutenant Orndorf; (10) Lieutenant Dunkle; (11) Captain Stevens; (12) John/Jane Doe #3; (13) John/Jane Doe #4; and (14) Superintendent Bickell.  Mobley alleges the following in his amended complaint.

On October 22, 2012, Mobley visited a cardiologist at J.C. Blair Memorial Hospital.  A few days later, Mobley was seen by the medical staff at SCI-Huntingdon for ongoing chest pains, rapid heartbeat, shortness of breath, and as a follow up to his visit a few days earlier to the cardiologist.  Later that same day, October 25, 2012, Mobley overhead another inmate—Anthony Earls—express concerns to defendants Prokop and Fessler about having to share a cell with a particular inmate.  Although Earls requested to talk to a "white hat," *i.e.,* a lieutenant, Prokop and Fessler denied his request and ordered Earls to return to his cell.  As Earls walked past Mobley's cell, Mobley told Earls that Prokop and Fessler cannot deny him a "white hat," that he should file a grievance if he does not feel safe with his cellmate, and that Earls can put him down as a witness to the fact that he had asked Prokop and Fessler to speak to a "white hat."

According to Mobley, he and Earls continued to talk and Earls expressed his frustration.  Defendant Snyder overheard their conversation and ordered Earls to his cell.  After Earls directed his frustration at Snyder, Snyder ordered him to "have a seat on center," which was an indication that Earls would be placed in the

Restricted Housing Unit (RHU), also known as the hole, because of a disciplinary infraction.  Mobley alleges that defendant Snyder then told defendants Prokop and Fessler that he would file a misconduct report against Earls and that he should put "that mutha' fucker Mobley in the hole too."  Mobley then told Snyder to keep him out of it, to which Snyder responded: "You was up there running your mouth.  You keep running your mouth and you can join Earls on center."

That same day, around 6:00 p.m., Mobley began experiencing cardiac symptoms.  According to Mobley, he had tightness and sharp pains in his chest, his heart was pounding, he was light headed, and he was breathing heavy.  Mobley called to defendant Snyder and told him that he did not feel well and that his chest hurt.  According to Mobley, Snyder responded by stating: "Oh you need me now.  Didn't you and your buddy Earls have a lot to say earlier[?]"  Mobley alleges that he emphatically reiterated that he needed medical assistance, and Snyder responded by saying that he was not calling anybody and that he would put Mobley in the hole.  According to Mobley, Snyder then walked away without summoning help.

A short time later, Mobley heard Snyder falsely tell other of the defendants that Mobley had threatened him.  Thereafter, defendant Dunkle ordered Mobley to "cuff up," and defendants Dunkle, Rhodes, and Nickum escorted him to the RHU.

Mobley details his numerous requests for medical assistance, and he alleges that the defendants ignored his requests.

According to Mobley, defendant Dunkle threatened to place Mobley in a hard cell, or psychiatric observation cell, if he did not shut up. Although defendant Dunkle called the medical department once Mobley arrived in the RHU, he did not tell the medical staff that Mobley was having chest pains. Instead, he just told the medical staff that, if Mobley gets medicine, they were to bring it. According to Mobley, he was placed in a cold cell without basic items and with no mattress and no underclothes (just a jumpsuit and shoes). Mobley again repeatedly pleaded for medical assistance, and again, he alleges, defendants Rhodes, Nickum, and Booher ignored his pleas.

Later, defendant Booher delivered to Mobley two misconduct reports from defendants Snyder, Fessler, Prokop, Orndorf, and Stevens. According to Mobley, the misconduct reports were fabricated and gave a false account of what had transpired. Mobley contends that the defendants issued the misconduct reports to attempt to cover-up their own misconduct in refusing to provide him with medical assistance. Mobley also contends that the defendants falsified the misconducts in retaliation for his earlier comments that Earls should file a grievance and that he would be a witness for Earls.

5

Mobley continued to ask for medical assistance, and Booher again ignored him. Later, a corrections officer provided Mobley with a mattress, and when Mobley asked for medical assistance, the officer told him that the pill-line nurse was coming soon. A short time later, Mobley was given underclothes and basic items. According to Mobley, his chest was still hurting, he had a dull pain in his left arm and armpit, he felt nauseous, he had pain going down his arm and in his face and jaw, and everytime he tried to sit up or move it felt like his chest was going to explode.

Finally, sometime after 8:30 p.m., a nurse came to Mobley's cell and noticed his condition. An EKG was done, and Mobely was given Nitroglycerin. At about 9:15 p.m., Mobley was taken to the hospital, and, according to Mobley, he was given heart attack and preventative care. The next day, Mobley returned to SCI-Huntingdon.

According to Mobley, he "suffered a heart attack or serious heart damage" on October 25, 2012, between 6:00 p.m. and 9:30 p.m. Mobley alleges that his need for medical assistance at the time was plain enough to be readily recognized by the defendants, and he alleges that as the result of the lack of medical treatment, he suffered intense physical pain as well as emotional distress. He alleges that two months later he discovered that he suffers from Left Ventricular Hypertrophy and Tricuspid Regurgitation. According to Mobley, both conditions are a result of high

6

blood pressure, heart attack, and heart injury.  Mobley contends that his heart

disease was aggravated by the delay in treating his cardiac distress on October 25,

2012, and he will experience diminished health for the rest of his life as a result of

the delay.  Further, although he did not need Nitroglycerin before then, since

October 25, 2012, Mobley has been placed permanently on Nitroglycerin for

ongoing chest pains and heart disease.  According to Mobley, he continues to

suffer emotional trauma and symptoms of heart failure as a result of the callous

manner in which the defendants denied him medical care.  Mobley also alleges that

his ability to earn a living and his quality of life have been diminished.

On October 30, 2012, Mobley filed a grievance about the alleged denial of

medical treatment and the alleged retaliation that he suffered.  Defendant Stevens

responded to the grievance, and in an attempt to cover up his own misconduct and

the misconduct of others, Stevens falsely stated that Mobley never requested

medical care.

Mobley's amended complaint raised retaliation, conspiracy, and Eighth

Amendment medical, conditions-of-confinement, and failure-to-train and failure-

to-supervise claims as well as state-law claims.  The defendants filed a partial

motion to dismiss the amended complaint, and the Court granted that motion and

dismissed the claims against the defendants in their official capacities, dismissed

the failure-to-train and failure-to-supervise claims against defendant Bickell, and

dismissed as moot Mobley's claims for injunctive relief.  Later, the Court

dismissed defendants John/Jane Doe #3 and #4.

The parties consented to proceed before a magistrate judge pursuant to 28

U.S.C. § 636(c), and the case was referred to the undersigned.  The remaining

defendants filed an answer to the amended complaint, and the parties engaged in

discovery.  The remaining defendants then filed a motion for summary judgment,

which we granted in part and denied in part; we granted the motion as to all claims

except the retaliation claim against defendant Snyder based on Misconduct Report

B576457 to the extent that that misconduct report charged Mobley with threatening

an employee.

Defendant Snyder then filed a motion for leave to file a second motion for

summary judgment, which we granted in part and denied in part.  We granted

Snyder leave to file a second motion for summary judgment limited to the issue of

qualified immunity, and Snyder then filed a second motion for summary judgment

arguing that he is entitled to qualified immunity.  After that motion was briefed,

defendant Snyder also filed a motion for leave to supplement his second motion for

summary judgment based on an intervening decision by Judge Caldwell in another

of Mobley's cases.  Because at the time of the events in this case it was not clearly

established that Mobley's speech to Earls was constitutionally protected, Snyder is

entitled to summary judgment on the basis of qualified immunity.  Given that

Snyder is entitled to qualified immunity, there is no need for Snyder to supplement his second motion for summary judgment to raise an additional possible basis for summary judgment.  Thus, we will grant Sndyer's second motion for summary judgment and deny as moot his motion for leave to supplement his second motion for summary judgment.

## III.  Summary Judgment Standards.

Defendant Snyder moves for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that

burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can

be no genuine issue as to any material fact, since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir.

2002)(quoting *Celotex,* 477 U.S. at 323).  "[S]ummary judgment is essentially 'put

up or shut up' time for the non-moving party: the non-moving party must rebut the

motion with facts in the record and cannot rest solely on assertions made in the

pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v.*

*Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).


## IV.  Discussion.

The remaining retaliation claim against Snyder is based on Misconduct

Report B576457, which Snyder issued on October 25, 2012, charging Mobley with

threatening an employee and with using obscene and abusive language to staff.

*Doc. 155-3* at 1.  In that misconduct report, Snyder stated that while he was dealing

with a situation on the second tier of A Block, Mobley said "these pussys always

hide behind misconducts and that bitch is scared." *Id.*  When questioned about

what he said, Mobley responded: "Fessler, she's a bitch, she's scared on this

block." *Id.*  Snyder then told Mobley that he would be receiving a misconduct

report, and, according to Snyder, Mobley responded by saying: "I don't give a

Fuck hide behind the misconduct to [sic]" and "You can come in here and see me,

now, tommorrow [sic] or next week  I don't give a fuck." *Id.*  Finally, Snyder

states in the misconduct report that while he was at the desk notifying control,

Mobley stated "come on up here pussy." *Id.*  The hearing examiner found Mobley

guilty and sanctioned him with 60 days of disciplinary custody time for the

abusive-language charge and 60 days for the threat charge. *Doc. 155-3* at 4.

Mobley claims that the misconduct report was false and that Snyder issued it

as retaliation for Mobley telling Inmate Earls to file a grievance and to put him

down as a witness.

"Retaliating against a prisoner for the exercise of his constitutional rights is

unconstitutional." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012).  Retaliation

claims are judged against exacting legal standards.  A prisoner claiming that a

defendant retaliated against him for exercising his constitutional rights must prove

that: (1) his conduct was constitutionally protected; (2) he suffered "adverse

action" at the hands of the defendant; and (3) his constitutionally protected conduct

was a substantial or motivating factor in the decision of the defendant. *Carter v.*

*McGrady,* 292 F.3d 152, 158 (3d Cir. 2002).  "Once a prisoner has made his *prima*

*facie* case, the burden shifts to the defendant to prove by a preponderance of the

evidence that [he or she] 'would have made the same decision absent the protected

conduct for reasons reasonably related to penological interest.'" *Id.* (quoting

*Rauser v. Horn*, 241 F.3d 330, 334 (3rd Cir. 2001)).  Prison officials may prevail

by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. *Rauser,* 241 F.3d at 334.

In connection with the first motion for summary judgment, the defendants argued that Mobley could not satisfy the first element of a retaliation claim because his statement to Inmate Earls to file a grievance and to put him down as a witness was not constitutionally protected conduct. In so arguing, the defendants suggested that Mobley was attempting to assert the rights of a third party (Inmate Earls), and that encouraging another inmate to file a grievance should not be given greater weight than threatening to file a grievance, which, according to the defendants, is not constitutionally protected conduct. We rejected those contentions:

> Mobley, however, is not attempting to assert the rights of Inmate Earls. Rather, he contends that he was retaliated against for his own speech, *i.e.,* his statements to Inmate Earls. Further, although the defendants cite a couple of cases in support of their contention that threatening to file a grievance is not constitutionally protected conduct, on appeal in one of the cases cited by the defendants, the Third Circuit, while deciding the retaliation claim on other grounds, in dicta questioned the contention that merely threatening to file a grievance is not constitutionally protected speech. *See Stewart v. Varano*, 601 F. App'x 107, 111 (3d Cir. 2015) ("The District Court concluded that Stewart had not engaged in such conduct here, because he had not actually filed a grievance when Eyster issued the misconduct; he had merely threatened to do so. But that is in fact Stewart's allegation—that he was retaliated against for *speaking,* which did take place at the relevant moment.").

14

Moreover, even assuming that making threats to file a grievance is not constitutionally protected conduct, here Mobley did not threaten the officers with the filing of a grievance. He merely told Inmate Earls to file a grievance and to put him down as a witness. The defendants have not argued, or pointed to any case law holding, that such speech is of a type that falls outside the protection of the First Amendment. *See Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 282–83 (3d Cir.2004) ("All speech is protected by the First Amendment except narrow categories that are entitled to no protection, including obscenity and 'fighting words.'"); *Torres v. Clark*, 522 F. App'x 103, 105-06 (3d Cir. 2013) (holding that a statement in a letter written by a prisoner that somebody is going to break an officer's jaw if he keeps acting like he [is] above the law was not constitutionally protected because it constituted a "true threat").

A prisoner's right to communicate with another prisoner may be limited by reasonable restrictions. *Turner v. Safley*, 482 U.S. 78, 89-94 (1987) (holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests" and upholding under that standard a regulation limiting correspondence between inmates at different institutions). Further, a prisoner does not have a right to provide legal assistance to another prisoner that enhances the protections otherwise available under *Tuner. Shaw v. Murphy*, 532 U.S. 223, 231-32 (2001) (declining "to cloak the provision of legal assistance with any First Amendment protection above and beyond the protection normally accorded prisoners' speech" and holding that regardless of whether prisoner correspondence contains legal advice "the proper constitutional test is the one . . . set forth in *Turner*"). In this case, however, the defendants do not assert that Mobley violated any prison regulation by talking to Earls and telling Earls to file a grievance and to put him down as a witness. Thus, we conclude for purposes of the current motion for summary judgment that Mobley engaged in constitutionally protected speech.

*Doc. 143* at 31-33.

**A. Defendant Snyder Is Entitled to Qualified Immunity.**

Defendant Snyder now contends that he is entitled to qualified immunity from Mobley's retaliation claim for damages based on the misconduct report because at the time he issued the misconduct report it was not clearly established that Mobley's statement to Earls was constitutionally protected conduct.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.*  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). In this case, we already concluded that Mobley presented evidence sufficient to withstand summary judgment as to the remaining retaliation claim against Snyder. We thus turn to the other prong of the qualified-immunity analysis—whether the law was clearly established.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. "This is an objective inquiry, to be decided by the court as a matter of law." *Doe v. Groody*, 361 F.3d 232, 238 (3d Cir. 2004). "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson,* 555 U.S. at 244 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)). If the law did not put the officer on notice that his conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012)

17

(quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *al-Kidd*, 563 U.S. at 743).

Because the qualified-immunity inquiry "focuses on the official's actual situation, the analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition . . . .'" *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Saucier,* 533 U.S. at 201).  Still, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in original).

In this case, it is not appropriate to define the right in question as the general right to be free from retaliation for one's speech.  For qualified immunity purposes, the law cannot be defined at such "a high level of generality." *al-Kidd*, 563 U.S. at 2084; *Reichle,* 132 S.Ct. 2094 ("Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause.").  Here, the

18

right in question is the right to be free from a prison misconduct report issued in

retaliation for advising or encouraging a fellow prisoner to pursue his grievance

through the administrative-remedy process.

The Third Circuit has held that filing a lawsuit and filing a grievance are

constitutionally protected conduct. *See Fantone v. Latini,* 780 F.3d 184, 192 n.8

(3d Cir. 2015) ("The filing of a prison grievance is an activity protected by the

First Amendment."); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)

("Mitchell's allegation that he was falsely charged with misconduct in retaliation

for filing complaints against Officer Wilson implicates conduct protected by the

First Amendment."); *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981)

(concluding that complaint alleging that prisoner was subjected to disciplinary

actions as retaliation for initiating a civil-rights suit against prison officials stated a

retaliation claim).  But, according to Snyder, he is entitled to qualified immunity

because there are no cases that have held that advising or encouraging another

inmate to file a grievance is protected speech.

Further, in addition to again analogizing this case to cases that have held that

a "threat of filing a grievance is not considered protected activity," *see e.g.*

*Dickerson v. Gordon*, No. 1:13-CV-1993, 2015 WL 5785575, at *6 (M.D. Pa.

Sept. 30, 2015), Snyder contends that in order to be protected by the First

Amendment, a prisoner's speech must relate to a matter of public concern.  He

cites *Oriakhi v. Wood*, in which Judge Vanaskie stated:

> Oriakhi identifies as the protected activity at issue here
> the verbal encounter with Wood regarding the replacement of a
> lost law library book, which ultimately led to Wood "snapping"
> at him and ordering him to leave his office.  This brief and
> isolated verbal inquiry does not constitute protected First
> Amendment speech.  To construe it as such would elevate every
> verbal exchange between a prison employee and a prisoner to
> the level of protected speech under the First Amendment.  In
> order to receive First Amendment protection, an inmate's
> speech must relate to a matter of public concern. *McElroy v.
> Lopac,* 403 F.3d 855, 858 (7th Cir.2005) (inmate's inquiry
> about pay for lost job was not a matter of public concern.)  "To
> presume that all matters which transpire within a government
> office are of public concern would mean that virtually every
> remark—and certainly every criticism directed at a public
> official—would plant the seed of a constitutional case."
> *Connick v. Myers,* 461 U.S. 138, 149, 103 S.Ct. 1684, 75
> L.Ed.2d 708 (1983).

*Oriakhi*, No. 3:CV-05-0053, 2006 WL 859543, at *5 (M.D. Pa. Mar. 31, 2006);

*see also Williams v. Klem*, No. 3:CV-07-1044, 2008 WL 4453100, at *5 (M.D. Pa.

Sept. 30, 2008) (holding that prisoner's directive to corrections officers who were

involved in a physical altercation with another inmate outside of the dining hall to

stop what they were doing was not constitutionally protected speech because the

prisoner was not speaking on a matter of public concern and because his actions

had the serious potential of inciting further discord).  Snyder suggests that it was

not clearly established that advising or encouraging another inmate to file a

grievance is speech on a matter of public concern, and, therefore, he is entitled to qualified immunity.

Mobley has not pointed to any cases holding that advising or encouraging another inmate to file a grievance is protected speech. Nor are we aware of any such Supreme Court or Third Circuit cases so holding.

"And 'to the extent that a robust consensus of cases of persuasive authority' in the Courts of Appeals 'could itself clearly establish the federal right'" at issue, *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Sheehan,* 135 S.Ct. at 1779), Mobley has not pointed to any such consensus on the question whether an prisoner advising or encouraging another prisoner to file a grievance is constitutionally protected conduct. On the other hand, Snyder points to cases that suggest that such is not constitutionally protected. *See Rouse v. Benson*, 193 F.3d 936, 941 (8th Cir. 1999) (stating that "inmates do not have a constitutional right to incite other inmates to file grievances or to assist other inmates in filing lawsuits"); *Chidubem v. McGinnis*, 134 F.3d 370 (6th Cir. 1997) (holding that an inmate telling another inmate to file a grievance after he witnessed a guard assault the other inmate did not support a retaliation claim and stating that "[e]ncouraging other inmates to file grievances, in addition to [the plaintiff's] own extensive proclivities in that area, interferes with prison administration and affects staff morale, and may be a legitimate basis for transferring a prisoner"); *Eady v. Lappin*,

21

2009 U.S. Dist. LEXIS 97513, *69 (N.D.N.Y Sept. 30, 2009) (recommending summary judgment on the basis of qualified immunity because the Second Circuit has not addressed the question whether a prisoner encouraging another inmate to file a grievance is constitutionally protected conduct), *adopting report and recommendation*, *Eady v. Lappin*, 2009 U.S. Dist. LEXIS 97486, *2, 2009 WL 3486663 (N.D.N.Y Oct. 21, 2009); *Williams v. Ingraham*, No. CIVA 904CV257 GLSDRH, 2007 WL 2713009, at *4 (N.D.N.Y. Sept. 14, 2007) (adopting magistrate judge's recommendation that the defendant be granted summary judgment on the basis of qualified immunity because at the time of the events in that case—March of 2001—the law was not clearly established that counseling another inmate to file a grievance or complaint was constitutionally protected speech); *Shields v. May*, No. 3:98 CV 7665, 1999 WL 681502, at *3 (N.D. Ohio Aug. 20, 1999) (holding that talking behind a prison official's back and encouraging another inmate to file a grievance was not constitutionally protected conduct because it conflicts with the penological concerns of institutional order and because it did not involve a matter of public concern).

Mobley analogizes his case to cases involving testimony by public employees. Generally, a public employee's testimony as a witness is constitutionally protected conduct. *See Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014) (holding that "the First Amendment protects a public employee who

provides truthful sworn testimony, compelled by subpoena, outside the scope of his

ordinary job responsibilities, but concluding that the defendant was entitled to

qualified immunity because the law was not clearly established under Supreme

Court or Eleventh Circuit caselaw); *Reilly v. City of Atl. City*, 532 F.3d 216, 231

(3d Cir. 2008) (stating that "the act of offering truthful testimony is the

responsibility of every citizen, and the First Amendment protection associated with

fulfilling that duty of citizenship is not vitiated by one's status as a public

employee," and concluding that "[t]he protected status of courtroom testimony was

clearly established").[3]  Mobley contends that his statement to Earls to put him

down as a witness is also constitutionally protected conduct.  But Mobley did not

actually testify or appear in court or at any proceeding.  Moreover, the cases on

which Mobley relies did not arise in the prison context, and Mobley has not

_____

[3] As some of the cases on which Mobley relies establish, not all appearances in
court or all testimony by public employees is entitled to constitutional protection.
*See Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 887-889 (3d Cir. 1997)
(holding the police officer's appearance in court as a character witness was a
matter of public concern but that his appearance created a likelihood of disruption
that outweighed the interests favoring his appearance, and, thus, his appearance
was not constitutionally protected); *Worrell v. Henry*, 219 F.3d 1197 (10th Cir.
2000) (concluding that testimony of a plaintiff, who was seeking a position as a
drug task-force coordinator, at a prior murder trial was not constitutionally
protected conduct with respect to a retaliation claim against his prospective
employer because although it addressed a matter of public concern, its disruption
to law-enforcement operations outweighed the plaintiff's interest in testifying at
the trial).

pointed to, and we are not aware of, cases that clearly establish that one prisoner's statement to another prisoner to list him as witness in connection with a prison grievance is constitutionally protected speech.

In sum, because the existing precedent did not place the constitutional question of whether Mobley engaged in constitutionally protected speech beyond debate, Snyder is entitled to qualified immunity.

### B.  Snyder's Motion to Supplement Is Moot.

Defendant Snyder also filed a motion for leave to supplement his second motion for summary judgment based on an intervening decision issued by Judge Caldwell in another of Mobley's cases—*Mobley* v. Lantz, Civil No. 1:CV-13-1804, 2016 WL 1221729 (M.D. Pa. Mar. 29, 2016).  In that case, rejecting in part a report and recommendation issued by the undersigned, Judge Caldwell held that a hearing examiner's finding of guilt based on some evidence is sufficient for a defendant to meet his burden of showing that he would have filed the misconduct charge even in the absence of the prisoner's protected conduct. *Id*. at *5.  Given our conclusion that Snyder is entitled to qualified immunity, we need not address whether we should reconsider our prior conclusion in light of Judge Calwell's decision in the other *Mobley* case.  Accordingly, we will deny as moot Snyder's motion to supplement his second motion for summary judgment.

## V.  Summary.

Accordingly, for the foregoing reasons, we will grant defendant Snyder's second motion (doc. 152) for summary judgment, and we will deny as moot Snyder's motion (doc. 158) for leave to supplement his second motion for summary judgment.  An appropriate order follows.


*__S/Susan E. Schwab__*
Susan E. Schwab
United States Magistrate Judge